# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ANDREW RANACIS, Derivatively on Behalf of TARGET CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BRIAN C. CORNELL, DAVID P. ABNEY, DOUGLAS M. BAKER, JR., GEORGE S. BARRETT, GAIL K. BOUDREAUX, ROBERT L. EDWARDS, DONALD R. KNAUSS, CHRISTINE A. LEAHY, MONICA C. LOZANO, GRACE PUMA, DERICA W. RICE, DIMITRI L. STOCKTON, MELANIE L. HEALEY, and MARY E. MINNICK, <br><br> Defendants, <br><br> -and- <br><br> TARGET CORPORATION, <br><br> Nominal Defendant. | Civil Action No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Andrew Ranacis ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Target Corporation ("Target" or the "Company") against the Individual Defendants (defined below) seeking to remedy their breaches of fiduciary duties and other violations of law from March 9, 2022, through the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by Target with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press

releases and other publications disseminated by Target; (c) review of news articles, stockholder communications, and postings on Target's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from a consolidated securities fraud class action pending in the United States District Court for the Middle District of Florida captioned, *Craig, et al. v. Target Corp. et al.*, Case No. 2:23-cv-599-JLB-KCD (the "Securities Class Action"); and (e) review of other publicly available information concerning Target and the Individual Defendants.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action asserting claims for breach of fiduciary duty and other violations of law against certain current and former officers and members of the Company's Board of Directors (the "Board").

2.      Target operates as a general merchandise retailer in the United States.  Target was incorporated in 1902 and is headquartered in Minneapolis, Minnesota.

3.      In 2014, Target hired Defendant Brian C. Cornell ("Cornell") as Chief Executive Officer ("CEO"), and the Board elected Cornell as Chairman of the Board.  After Cornell's hiring, Target began adopting several ESG (Environmental, Social, and Governance) and DEI (Diversity, Equity, and Inclusion) initiatives.  These initiatives were adopted into Target's business strategy.

4.      In June 2015, Target began a Pride Month campaign where Target published a "Pride Manifesto" and accompanying video transcript.  The next year Target published an announcement in opposition to a North Carolina transgender bathroom law.

5.      Target experienced customer and investor backlash after both publications. Shareholders, consumer groups, and conservative commentators, among others, warned the

Individual Defendants multiple times that future ESG, DEI and LGBT initiatives would cause the Company to lose customers.

6.     In breach of their fiduciary duties, the Board signed annual reports and proxy statements in 2022 and 2023 which included misleading statements and omissions.  Specifically, those filings misled investors by either falsely stating or omitting the risk of customer boycotts from its ESG, DEI, and LGBT initiatives.  As a result of those misstatements and omissions, shareholders re-elected members of the Board.

7.     In May 2023, Target implemented a children and family themed "Pride Month" marketing and sales campaign which focused on displaying "Pride Month" related merchandise at Target stores across the United States.  The backlash was swift.  Customers boycotted Target, causing Target to lose $10 billion in market valuation between May 18 and May 23, 2023.

8.     As a result of the Individual Defendants' actions, Target has lost billions in market capitalization.  Between May 17 and October 6, 2023, Target lost more than $25 billion in market capitalization.

9.     The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by knowingly engaging in the deceptions alleged herein.

10.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Target has sustained damages as described below.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)(1)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Minnesota or is an individual who has sufficient minimum contacts with Minnesota so as to render the exercise of jurisdiction by the Minnesota courts permissible under traditional notions of fair play and substantial justice.

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains executive offices in this District, including nominal defendant Target, a substantial portion of the transactions and wrongs complained of herein – including Defendants' (defined below) primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Target – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15.     Plaintiff Andrew Ranacis is and has continuously been a stockholder of Target during the wrongdoing complained of herein.

16.     Defendant Target is a Minnesota corporation with principle executive offices located in Minneapolis, Minnesota.  Target's shares trade on the New York Stock Exchange under the ticker symbol "TGT."

17.     Defendant Cornell has served as Target's CEO and Chair of the Board since August 2014.  Cornell signed the 2021 and 2022 Annual Reports and 2022 and 2023 Proxy Statements, and he is named as a defendant in the Securities Class Action.

18.     Defendant David P. Abney ("Abney") has served as a member of the Board since 2021.  During the Relevant Period, Abney served as a member of the Audit & Risk Committee. Abney signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

19.     Defendant Douglas M. Baker, Jr. ("Baker") has served as a member of the Board since 2013.   During the Relevant Period, Baker served on the Governance and Sustainability Committee.  Baker signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

20.     Defendant George S. Barrett ("Barrett") has served as a member of the Board since 2018.  During the Relevant Period, Barrett served on the Governance and Sustainability Committee. Barrett signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

21.     Defendant Gail K. Boudreaux ("Boudreaux") has served as a member of the Board since 2021.   During the Relevant Period, Boudreaux served as a member of the Audit & Risk Committee.  Boudreaux signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

22.     Defendant Robert L. Edwards ("Edwards") has served as a member of the Board since 2015.  During the Relevant Period, Edwards served as a member of the Audit & Risk Committee and served as Chair until June 2024.  Edwards signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

23.     Defendant Donald R. Knauss ("Knauss") has served as a member of the Board since 2015.  Knauss signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

24.     Defendant Christine A. Leahy ("Leahy") has served as a member of the Board since 2021.  During the Relevant Period, Leahy served on the Governance and Sustainability Committee. Leahy signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

25.     Defendant Monica C. Lozano ("Lozano") has served as a member of the Board since 2016.   During the Relevant Period, Lozano served on the Governance and Sustainability Committee.  Lozano signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

26.     Defendant Grace Puma ("Puma") has served as a member of the Board since 2022. During the Relevant Period, she served as a member of the Audit & Risk Committee.  Puma signed the 2023 Proxy Statement and is named as a defendant in the Securities Class Action.

27.     Defendant Derica W. Rice ("Rice") has served as a member of the Board since 2020. During the Relevant Period, Rice served as a member of the Audit & Risk Committee.  Rice signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

28.     Defendant Dimitri L. Stockton ("Stockton") has served as a member of the Board since 2018.  During the Relevant Period, Stockton served as a member Audit & Risk Committee and the Governance and Sustainability Committee.  Stockton signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

29.     Melanie L. Healey ("Healey") served as a member of the Board from 2015 until June 2023.  Healey signed the 2022 and 2023 Proxy Statements and is named as a defendant in the Securities Class Action.

30.     Defendant Mary E. Minnick ("Minnick") served as a member of the Board from 2005 until June 2022.  Minnick signed the 2022 Proxy Statement and is named as a defendant in the Securities Class Action.

31.     Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Knauss, Leahy, Lozano, Puma, Rice, Stockton, Healey and Minnick are referred to herein as the "Individual Defendants."

### THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS SHAREHOLDERS

32.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company.  By virtue of such duties, the officers and directors of Target were required to, among other things:

- ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

- ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

35.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.     In addition, the Company has also adopted a Code of Ethics (the "Code") which applies to members of the Board.  The purpose of the Code is: "to focus the Board and each Director on areas of ethical risk, provide guidance to Directors to help them recognize ethical issues and understand how to report unethical conduct, and help foster a culture of honesty and accountability."

37.     The Code goes on to state: "Directors should comply with all applicable laws, rules, and regulations.  Directors are subject to and must comply with the Corporation's Securities Trading Policy.   Directors  should  deal  fairly  with  Target's  team  members,  guests,  suppliers,  and competitors."

38.     Additionally, defendants Baker, Barrett, Healey, Leahy, Lozano, and Stockton, who served on the Governance & Sustainability Committee during the Relevant Period, owed specific duties to Target pursuant to the Governance and Sustainability Charter (the "Charter"), which clearly outlined the Committee's responsibilities with regard to oversight of ESG and political and social risk:

> **ESG & Corporate Responsibility Matters.**  Oversee the Corporation's overall approach to environmental, social & governance and corporate responsibility matters, including:

*      *      *

- identification of the ESG-related topics that are most relevant and important to the Corporation and any goals or aspirations related thereto;

  \*       \*       \*

- social and political issues and risks impacting the Corporation (other than the human capital matters overseen by the Compensation & Human Capital Management Committee and the supply chain matters overseen by the Audit & Risk Committee);

- the Corporation's philanthropy and community engagement activities;

- external reporting on ESG and corporate responsibility matters.

  **<u>Public Advocacy and Political Activities.</u>**  Oversee the Corporation's policies and practices regarding public policy advocacy and political activities, including the process for selecting issues for engagement, lobbying activities, political contributions with corporate funds (including support of other organizations that may engage in political activity), and the activities of any political action committee organized by the Corporation.

39.     The Charter describes the Governance & Sustainability Committee's oversight responsibility for "social and political issues and risks impacting the Corporation" as distinct from the Committee's other responsibilities, including the Committee's oversight of the "identification of ESG-related topics," "philanthropy and community engagement," and even "public advocacy and political activities."

40.     The Charter also describes that the Governance & Sustainability Committee's oversight responsibility for "social and political issues and risks impacting the Corporation" is also distinct from "human capital matters overseen by the Compensation & Human Capital Management Committee" and "supply chain matters overseen by the Audit & Risk Committee."

41.     The Company's Audit Committee members also had additional duties under the Audit Committee Charter.  The Audit Committee Charter explains the purpose of the Audit Committee (comprised of defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton) during the Relevant Period), which is to "[a]ssist the Board of Directors in overseeing (i) the

integrity of the Corporation's financial statements; (ii) the independence, qualifications and performance of the Corporation's independent auditor; (iii) the performance of the Corporation's internal audit function; (iv) the Corporation's compliance and ethics programs; and (vi) the Corporation's enterprise risk management program."

42.     Duties of the Audit Committee members include:

Internal Controls.  Receive information from management about any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting.    Review and discuss with management and the independent auditor, the report of management on internal control over financial reporting and the independent auditor's report on internal control over financial reporting prior to the filing of the Corporation's Form 10-K.

General Oversight.    Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles and any critical accounting estimates made in the course of preparing the financial statements.

Audit Plan Risk Assessment.  Review and discuss with the head of internal audit the internal audit function's ongoing assessments of the Corporation's risk management processes and system of internal control, and the commitment of internal audit resources to audit the Corporation's guidelines, policies and procedures to mitigate identified risks.

Such discussions should encompass the Corporation's principal financial, accounting, internal control and related risk exposures and, as appropriate, include the Corporation's principal risk officer.

Compliance and Ethics Programs.  Oversee the Corporation's compliance and ethics programs, including those related ethics, legal, and regulatory matters, and receive periodic reports on such programs from appropriate management, including information on any significant compliance and ethics issues and the budget and staffing for the Corporation's compliance and ethics function.

Compliance and Ethics Monitoring.  Oversee the effectiveness of the process used by management to identify, investigate and address allegations of potential misconduct and violations of compliance and ethics policies, including the Corporation's Code of Ethics (or any successor code of conduct) and possible legal or regulatory violations.

Enterprise Risk Management Program.  Oversee the Corporation's enterprise risk management program to obtain an understanding of the primary enterprise risks facing the Corporation, including:

> • management's process for identifying and assessing risks and, where appropriate, employing strategies for risk mitigation; and
>
> • the budget and staffing for the Corporation's enterprise risk management function.

Principal Business and Operational Risks.  Oversee the principal business and operational risks facing the Corporation, including:

> • vendor risk management
>
> • cybersecurity and information security
>
> • privacy
>
> • product safety, including food safety
>
> • business continuity and disaster recovery.

Coordination of Risk Oversight.  Periodically review the Corporation's approach to risk identification, assessment and mitigation strategies with the Board to facilitate coordination with the activities of the Board and other Board Committees.

43.    The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of their fiduciary duties described herein.

## SUBSTANTIVE ALLEGATIONS

44.    Target operates as a general merchandise retailer in the United States.

45.    In its SEC filings, Target admits that the Company's core is "families."  In the 2022 Form 10-K filed with the SEC on March. 8, 2023, the Company states: "Our continued success is dependent on positive perceptions of Target which, if eroded, could adversely affect our business and our relationships with our guests and team members."

46.    After the hiring of Cornell as CEO and his appointment as Chair, Target began to emphasize ESG and DEI initiatives in its business and corporate culture, with the stated purpose of benefitting various Company "stakeholders."

47.    In 2019, defendant Cornell, in his capacity as the Chairman and CEO of Target, signed the Business Roundtable's "Statement on the Purpose of a Corporation" (the "BRT Statement"), in which he pledged to make "a fundamental commitment to <u>all</u> of our stakeholders," noting that "[e]ach of our stakeholders is essential," and that Target was committed "to deliver[ing] value to all of them."

48.    In its commitment to manage Target in like with stockholder values, Target has explicitly stated that the Board's "governance and management systems" also "fully implement the [BRT] Statement of Purpose."

49.    The initiatives that Target identifies as responsive to each of the BRT Statement's "stakeholder" interests, and which Target describes as being at the "core of the Company's values" and governance, include initiatives that correspond directly to progressive positions on ESG and DEI matters.  Examples include:

- The BRT Statement included "protecting the environment by embracing sustainable practices."  Because of this, Target made commitments to climate change;

- In accordance with the BRT, Target pledged to invest $2 billion in Black-owned businesses by 2025;

- The BRT Statement included "[i]nvesting in our employees" as a relevant stakeholder interest and because of this, among other things, Target touted its "diversity & inclusion" and DEI programming; and

- Target includes pro-transgender policies as part of its "company value" of "inclusivity," welcoming its employees to "use the restroom or fitting room facility that corresponds with their gender identity."

**Target Engages in LGBTQ Activism**

50.    Target has directly partnered and donated millions to pro-LGBT stakeholder organizations for its ESG/DEI mandates.  For example:

- Target has donated millions to "GLSEN" which promotes LGBT activism.

- Target included GLSEN promotions on displays next to merchandise during its 2023 LGBT Pride Campaign.

- Target has partnered with the LGBT stakeholder organization Gay & Lesbian Alliance Against Defamation (GLAAD).

- Target has partnered with Out & Equal, an activist organization that works on LGBT issues in the workplace.

51.     In May 2012, Target launched its first reported LGBTQ-themed merchandise and announced it would donate the proceeds of merchandise sales to the Family Equality Council.  The campaign bore such slogans such as "Love is love" and "Harmony."

52.     In August 2014, after years of remaining neutral on the issue, Target announced that it had signed an amicus brief "in support of marriage equality."  In response, a number of groups opposed to that position organized a consumer protest and urged consumers to boycott the Company.  The petition associated with the protest reportedly received double its targeted number of signatures.

53.     In 2015, Target announced that it would eliminate gender labels on children's toys and other merchandise.  Target stated it was doing so because "guests have raised important questions about a handful of signs in our stores based on gender," and that Target would be "phas[ing] out gender-based signage."

54.     Target's initiative to eliminate "boys" and "girls" labeling on toys and other merchandise sparked public outcry from public figures, who called on consumers to respond.

55.     For instance, the Reverend Franklin Graham, president of the Billy Graham Evangelistic Association, published a Facebook post that was liked by over 102,000 users that stated: "I think Target may be forgetting who has made their stores strong.  It's not gender-neutral people out there—it's working American families, fathers and mothers with boys and girls they

love" and "let Target know what you think.  Let them know that you are perfectly willing to shop where the genders God created are appreciated."

56.     In April 2016, North Carolina legislature enacted a law that limited bathroom access to the sex listed on one's birth certificate.  Target responded by publishing a blog post, which was reportedly not reviewed by senior management, "welcoming transgender employees and shoppers to use restrooms and fitting rooms corresponding with their gender identities" and changing Target's signature "red bullseye logo into a gay-pride rainbow."

57.     The public outcry was swift.  More than 1.5 million people pledged to boycott Target over its transgender bathroom policy after a campaign from the American Family Association and other groups.   Target's same-store sales growth fell in each of the next three quarters after publishing the blog post in April 2016.

58.     Additionally, Target was forced to spend $20 million to add private bathrooms to the stores that didn't have them and embark on a multibillion-dollar revamp of the stores that were falling behind as a result.

59.     Although defendant Cornell publicly defended the decision to publish the blog post, he reportedly admitted to Target staff that the Company "didn't adequately assess the risk, and the ensuing backlash was self-inflicted."  But "it was too late to reverse course."

60.     Consumer backlash resulting from Target's transgender bathroom policy lasted into 2017 and 2018.  At the same time, Target continued to face consumer backlash and social and political blowback from its Pride Month campaigns and LGBT merchandise.

61.     Despite the public outcry regarding its LGBTQ activities and the risks associated with these actions, Target expanded its LGBTQ activism with the 2023 Pride Month campaign.

62.     Indeed, Target knew of the known risks with pushing forward with its ESG/DEI initiatives but wrote them off.  For instance, in April 2023, a month before Target began the Pride Month Campaign, a consumer boycott of the brand Bud Light over its LGBT marketing campaign cost the brand over 25 percent in sales.

63.     Given the public backlash from Bud Light, Target knew that the consumer environment was changing with respect to Target's Pride Month campaigns.  However, the Individual Defendants recklessly pushed forward.

**The Individual Defendants Cause Target
To Issue Materially False & Misleading Statements**

64.     On March 9, 2022, Target filed its Form 10-K (the "2021 10-K") with the SEC, which was signed by defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Minnick, Rice, and Stockton.  With regard to the risks from the Company's ESG and DEI initiatives, the 2021 10-K stated, in relevant part:

> We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the reputation we have built over many years for serving those constituencies and the communities in which we operate.  To be successful in the future, we must continue to preserve Target's reputation.  Our reputation is based in large part on perceptions, both about us and others with whom we do business, and broad access to social media makes it easy for anyone to provide public feedback that can influence perceptions of Target.  It may be difficult to control negative publicity, regardless of whether it is accurate.  Target's responses to crises and our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation.   While reputations may take decades to build, ***negative incidents involving us or others with  whom  we  do business  can  quickly  erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation.*** For example, we have a limited ability to end our relationship with CVS, which leases space to operate their clinics and pharmacies within our stores.  If our guests have negative experiences with or unfavorably view CVS or other companies with whom we have relationships, it could cause them to reduce or stop their business with us.  ***Negative reputational incidents could adversely affect our business and results  of  operations,  including  through  lost  sales,  loss  of  new  store  and development opportunities, or team member retention and recruiting difficulties.***

(Emphasis added).

65.    The statements in the 2021 10-K were also incorporated by reference into Target's

quarterly reports on Form 10-Q filed with the SEC on May 27, 2022, August 6, 2022, and November

23, 2022, with each report stating that "[t]here have been no material changes to the risk factors

described" in the 2021 10-K.

66.    On April 25, 2022, Target filed a Proxy Statement on Schedule 14A with the SEC

(the "2022 Proxy"), which described the Board's key role in risk oversight as follows:

**Risk oversight**

Oversight of the various risks we face in implementing our strategy is an integral
and continuous part of the Board's oversight of our business.  The Board, each
Committee, and management have specific roles and responsibilities with respect
to those risks.

**The Board and its Committees**

The Board provides oversight of overall risks, with emphasis on strategic risks,
which occurs as an integral and continuous part of the Board's oversight of our
business and seeks to ensure that management has processes in place to
appropriately manage risk.  For example, our principal strategic risks are reviewed
as part of the Board's regular discussion and consideration of our strategy,
including the development and monitoring of specific initiatives and their overall
alignment with our strategy.  Similarly, at every meeting the Board reviews the
principal factors influencing our operating results, including the competitive
environment, and discusses with our senior executive officers the major events,
activities, and challenges affecting Target.

The Audit & Risk Committee oversees our enterprise risk management program
and periodically reviews our approach to risk identification, assessment, and
mitigation strategies with the Board to facilitate coordination with the activities of
the Board and other Committees.  The Chief Legal & Risk Officer provides the
Audit & Risk Committee with regular updates on the enterprise risk management
program and the status of key risks facing the business.  The Audit & Risk
Committee also regularly receives updates on key risk areas from other members of
management with primary responsibility for managing those risk areas, and
regularly reviews legal and regulatory risk, compliance, and ethics matters.

67.     The 2022 Proxy also emphasized the significance of "ESG matters" to the Board's risk oversight, and described how the Board allocates oversight and responsibilities of each Committee with regard to ESG:

Sustainability & ESG

We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible.  Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy. . . . Given the breadth of ESG matters for a company of our size and scale, oversight of those issues is allocated throughout the Board and its Committees:

Board

- Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)
- Top ESG risks
- Reputation management
- Crisis management and response
- Organizational team health

Audit & Risk Committee

- Compliance and ethics
- Supply chain ESG, including vendor human capital and responsible sourcing practices

*       *       *

Governance & Sustainability Committee

- Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)
- Environmental stewardship practices (including climate and energy, waste, natural resources, and chemicals)
- Social and political issues and risks not allocated to other Committees
- Philanthropy and community engagement
- Policies and practices regarding public policy and political activities

68.     Although the 2022 Proxy made clear that the full Board, the Audit & Risk Committee, and the Governance & Sustainability Committee were all responsible for oversight of

various "ESG matters," only the Governance & Sustainability Committee was described as overseeing "social and political issues and risks."

69.     On March 8, 2023, the Company filed its Form 10-K with the SEC (the "2022 10-K"), purporting to disclose "the material risks we face."

70.     Unlike the 2021 10-K, however, the 2022 10-K did not address the risk of ESG or DEI in its discussion of reputational risks that could lead to "consumer boycotts." Instead, the 2022 10-K indicated that there was a risk to the Company if it failed to "achieve" its ESG and DEI mandates. The 2022 10-K stated, in relevant part:

> [S]takeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us.

71.     The statements in the 2022 10-K were also incorporated by reference into Target's quarterly reports on Form 10-Q filed with the SEC on May 26, 2023 and August 25, 2023, with each report stating that "[t]here have been no material changes to the risk factors" described in the 2022 10-K.

72.     On May 1, 2023, Target filed a Proxy Statement on Schedule 14A with the SEC (the "2023 Proxy"), which described the Board's key role in risk oversight in nearly identical terms as those used in the 2022 Proxy:

> **Risk oversight**
>
> Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.

**The Board and its Committees**

The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.

The Audit & Risk Committee oversees our enterprise risk management program and periodically reviews our approach to risk identification, assessment, and mitigation strategies with the Board to facilitate coordination with the activities of the Board and other Committees. The Chief Legal & Risk Officer provides the Audit & Risk Committee with regular updates on the enterprise risk management program and the status of key risks facing the business. The Audit & Risk Committee also regularly receives updates on key risk areas from other members of our Leadership Team (and certain members of their teams with primary responsibility for managing those risk areas), and regularly reviews legal and regulatory risk, compliance, and ethics matters.

73.    The 2023 Proxy also emphasized the significance of "ESG matters" to the Board's risk oversight, and described the Board's allocation of oversight of those matters throughout the Board and its committees as follows:

**Sustainability & ESG**

We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy. . . . Given the breadth of ESG matters for a company of our size and scale, oversight of those issues is allocated throughout the Board and its Committees:

Board

- Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)
- Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)

- Reputation management
- Crisis management and response
- Organizational team health

Audit & Risk Committee

- Compliance and ethics
- Supply chain ESG, including vendor human capital and responsible sourcing practices

*       *       *

Governance & Sustainability Committee

- Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)
- Environmental stewardship practices (including climate and energy, waste, natural resources, and chemicals)
- Social and political issues and risks not allocated to other Committees
- Philanthropy and community engagement
- Policies and practices regarding public policy and political activities

74.    Although the 2023 Proxy made clear that the full Board, the Audit & Risk Committee, and the Governance & Sustainability Committee were all responsible for oversight of various "ESG matters," only the Governance & Sustainability Committee was described as overseeing "social and political issues and risks."

75.    The statements contained in the 2022 Proxy and the 2023 Proxy described above were materially false and misleading because the Governance and Sustainability Committee did not oversee social and political issues and risks arising from Target's ESG matters.  Instead, the committee oversaw Target's engagement with "stakeholders" to advance ESG and DEI initiatives regardless of the social or political issues or risks Target would face.

76.    Based on the statements in the 2022 Proxy and 2023 Proxy, given the responsibilities of the Governance and Sustainability Committee, a shareholder would surmise that the Governance and Sustainability Committee was overseeing any material risks relating to Target's adoption and

implementation of ESG goals, regardless of whether it was pro ESG goals or not.  However, in actuality, the Board only oversaw perceived issues and risks from one side of the spectrum.

77.     Moreover, rather than overseeing social and political issues and risks to protect shareholder interests by serving Target's customers, as the 2022 Proxy and the 2023 Proxy represented, the actual oversight responsibility Target's Board and the Governance & Sustainability Committee exercised focused on potential negative responses by "stakeholders" to Target's perceived failure to achieve ESG and DEI initiatives.  And the "stakeholders" were not regulators or Target customers, but a group of nonprofit stakeholder activists and organizations that Target consults in making its ESG and DEI commitments.

78.     Thus, the Governance and Sustainability Committee was not overseeing social and political issues and risks as the 2022 Proxy and the 2023 Proxy represented.

**Target's 2023 Pride Month Campaign Causes Public Backlash**

79.     In May 2023, after issuing the false and misleading 2023 Proxy, Target engaged in the controversial LGBT Pride Month Campaign (the "2023 Pride Month Campaign").  Target began stocking its stores with LGBT-themed clothing targeted at children, families, and others.

80.     Target's website listed over one hundred (100) products under the category "LGBT Pride:  Kids' Clothing" which was modeled by children and used themes and figures to attract children.

81.     Target stores also offered a wide array of LGBTQ merchandise in the children's section.  Target stocked controversial merchandise as part of its 2023 Pride Month Campaign, including "T-shirts that said, 'Pride Adult Drag Queen "Katya"'', "Trans people will always exist!'" and "'Girls Gays Theys'" and extra-extra-small "swimsuits with clothing tags that describe the items as having a 'light binding effect' on breasts and 'tuck-friendly construction' for male genitalia" with "extra crotch coverage."

82.     Predictably, Target consumers were outraged and called for boycotts.  Many consumers uploaded videos of offensive merchandise they saw at Target online on social media websites, and several videos were viewed millions of times.

83.     The backlash by consumers prompted the largest boycott and reduced demand for Target in recent history, leading to billions of dollars in investor losses.

84.     Prior to the backlash of the 2023 Pride Month Campaign, on May 17, 2023, Target's stock price was priced at around $160.96.  Between May 17 and October 6, 2023, more than $25 billion in Target's market capitalization was lost.

85.     News reports stated that Target lost at least $10 billion in market valuation between May 18, 2023, and May 28, 2023, due to the public backlash over the 2023 Pride Month Campaign.  By October 6, 2023, Target's market capitalization had decreased by more than $25 billion, with its stock price hitting a low of $105.01 per share.  In fact, the Company's stock price has never recovered to its pre-campaign level.

86.     On May 24, 2023, Target management issued a press release titled, "Target Statement on 2023 Pride Collection," in which it both announced changes to its Pride Month Campaign due to consumer backlash, however, the Company committed to its initiatives, stating:

> For more than a decade, Target has offered an assortment of products aimed at celebrating Pride Month.  Since introducing this year's collection, we've experienced threats impacting our team members' sense of safety and well-being while at work.  Given these volatile circumstances, we are making adjustment to our plans, including removing items that have been at the center of the most significant controversial behavior.  Our focus now is on moving forward with our continuing commitment to the LGBTQIA+ community and standing with them as we celebrate Pride Month and throughout the year.

87.     Just days after issuing this press release, Target expanded the number of stores pulling back Pride items, stating that this change was due to safety concerns. However, Target

employees posted online that there were no actual threats to their safety and instead, Target was removing the items because of the public backlash.

88.    Eventually, Target revealed that the true reasons for re-locating Pride merchandise to less prominent areas in the store was never because of threats but was actually done to lessen the consumer backlash and lost sales resulting from the 2023 Pride Month Campaign.

89.    On August 16, 2023, Target reported its earnings for the second quarter of 2023, which included the months of May, June, and July during which the 2023 Pride Month Campaign had occurred.  Target reported that its comparable sales fell for the first time in six years, declining 5.4 percent in the quarter.

90.    During the earnings call hosted by the Company that same day, Target's Chief Growth Officer, Christina Hennington, called "the strong reaction to this year's Pride assortment" a "headwind" that negatively affected earnings.

91.    On November 15, 2023, Target reported its earnings for the third quarter of 2023, noting that comparable sales continued to fall, declining 4.9%, and that digital comparable sales fell 6%.

92.    In an interview with CNBC that month, defendant Cornell admitted that Target exposed itself to consumer backlash because "we set the presentation earlier than everyone else" by beginning in May, and because the display "was very prominent."

93.    Target executives also admitted that, in the future, they planned to mitigate the risk of consumer backlash by re-locating Pride merchandise to less prominent areas of the store, just as they did after customer backlash to the 2023 Pride Month Campaign.

94.    The 2023 Pride Month Campaign was so controversial to Target's core customer base that no reasonable Board oversight of social and political issues and risks of ESG matters

would have permitted it to go forward.  Indeed, the fact that Target participated in the controversial 2023 Pride Month Campaign demonstrates the Board's lack of oversight of social and political issues and risks.

95.    Shareholders would not have elected the Individual Defendants to the Board if they had been told the truth of the Board's allowing of the 2023 Pride Month Campaign and lack of oversight of social and political issues and risks.

## THE SECURITIES CLASS ACTION

96.    In December 2024, the U.S. District Court for the Middle District of Florida denied Target's motion to dismiss a class action securities fraud lawsuit related to their DEI and ESG initiatives and the 2023 Pride Month Campaign and associated backlash.  The plaintiffs allege that Target's proxy statements failed to adequately disclose the risk of consumer boycotts related to the campaign, leading to significant market valuation losses.  Specifically, Securities Class Action alleged that Target failed to properly disclose the risks associated with their DEI and ESG initiatives, which resulted in a backlash and significant market losses.

97.    On December 4, 2024, the court in the Securities Class Action denied Target's motion to dismiss, finding that the plaintiffs had sufficiently alleged that Target knew of the risks and failed to provide tailored disclosures.  With regard to Target's proxy statements, the court found that "the existence of the GSC [Governance and Sustainability Committee] implies a structured investigation and analysis of social and political risks.  Further, due to its formal status, the GSC creates the impression amongst investors that social and political risks are being considerably analyzed, reviewed, and monitored."  The court found that recurrent boycotts of prior LGBT campaigns and Target's response to the North Carolina bathroom law "demonstrate that it is plausible that Target, its Board, and its GSC may have ignored social and political risks relating to

the 2023 Pride Month Campaign." As such, the court concluded that the 2022 Proxy Statement and 2023 Proxy Statement were false and misleading.

## DAMAGES TO TARGET

98.  As a direct and proximate result of the Individual Defendants' misconduct, Target disseminated improper public statements concerning Target's business condition.

99.  As a direct and proximate result of the Individual Defendants' actions, Target has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

100.  As a direct and proximate result of the Individual Defendants' actions as alleged above, Target's market capitalization has been substantially damaged, losing billions of dollars in value as a result of the conduct described herein.

101.  Moreover, these actions have irreparably damaged Target's corporate image and goodwill. For at least the foreseeable future, Target will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Target's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

102.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.  Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

104.    Plaintiff is an owner of Target common stock and was an owner of Target common stock at all times relevant hereto.

105.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

106.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Target Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action; at least half (6) of the directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

107.    At the time this action was commenced, the Board consisted of twelve (12) directors: defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Knauss, Leahy, Lozano, Puma, Rice, and Stockton (the "Director Defendants").

**The Board Faces a Substantial Likelihood of Liability**

108.    Demand is excused as to the entire Board, because the Director Defendants breached their fiduciary duties of loyalty by making false and misleading statements about the risk of consumer backlash, boycotts, and financial damage related to Target's ESG and DEI initiatives. The Director Defendants were directors during the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, and internal controls were accurate.  Indeed, each of the Director Defendants signed either the 2022 Proxy or the 2023 Proxy, or both, which were found to be false and misleading by the court in the Securities Class Action.  Accordingly, the entire Board faces a substantial likelihood of liability for making materially false and misleading statements.

109.    Moreover, defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of financial statements and allowed the Company to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton were responsible for Target's financial statements and the Company's compliance with legal and regulatory requirements. Instead, defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements regarding the risk of consumer backlash, boycotts, and resulting financial damage to the Company related to Target's ESG & DEI initiatives. Accordingly, defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.

110.    Furthermore, defendants Baker, Barrett, Leahy, Lozano, and Stockton, as members of the Governance and Sustainability Committee, failed to adequately oversee social and political risks stemming from Target's ESG and DEI initiatives, as required by the Governance and Sustainability Charter and as represented in the Company's proxy statements which they signed. Accordingly, defendants Baker, Barrett, Leahy, Lozano, and Stockton breached their fiduciary duty because they participated in the wrongdoing described herein.

111.    Finally, the Director Defendants are named as defendants in the Securities Action, in which the motion to dismiss was denied. Thus, each of these defendants faces a substantial likelihood of liability for the misconduct alleged herein.

**FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

112.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

113.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

114.    Section 14(a) of the Exchange Act, provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]." 15 U.S.C. § 78n(a)(1).

115.    Rule 14a-9, promulgated pursuant to Section 14(a), provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

116.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the 2022 Proxy and the 2023 Proxy were materially false and misleading.  The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2022 Proxy and the 2023 Proxy, including, but not limited to, election of directors.

117.    The false and misleading elements of the 2022 Proxy and the 2023 Proxy led to the re-elections of the Individual Defendants, allowing them to breach their fiduciary duties to Target.

118.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy and 2023 Proxy.

119.    Plaintiff, on behalf of Target, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

120.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

121.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Target's business and affairs as directors and/or officers of the Company.

122.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonably inquiry, oversight, and supervision.

123.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties owed to the Company, as alleged herein.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Target.

124.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

125.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

126.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes, even though conflicting facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

127.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Target has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to Target.

128.    Plaintiff, on behalf of Target, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Target and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law;

C.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on issues so triable.

Respectfully submitted,

**WARNER LAW, LLC**
*a Professional Limited Liability Company*

DATED: July 1, 2025                    By: */s/ George E. Warner, Jr.*
George E. Warner, Jr. (#222719)
120 South Sixth Street, Suite 1515
Minneapolis, Minnesota 55402
Telephone: (952) 922-7700
Email: george@warnerlawmn.com

*Attorney for the Plaintiff*

*Of Counsel*
Melissa A. Fortunato (NY Bar # 5205968)
Marion C. Passmore (NY Bar # 5805676 )
BRAGAR EAGEL & SQUIRE, P.C.

810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
Fortunato@bespc.com
Passmore@bespc.com

*Pro Hac Vice to be filed*

Ligaya T. Hernandez (PA Bar # 210229)
BRAGAR EAGEL & SQUIRE, P.C.
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (646) 860-9155
Facsimile: (212) 214-0506
Hernandez@bespc.com

*Pro Hac Vice to be filed*

## VERIFICATION

I, Andrew Ranacis, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of Target Corporation., and authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further declare that I am a current holder of Target Corporation. stock and have continuously held Target Corporation stock from the time of the wrongdoing alleged herein until the present. I declare under penalty of perjury that the foregoing is true and correct.

Executed this __3__ day of June 2025.

*Andrew Ranacis*
Andrew Ranacis (Jun 3, 2025 16:47 PDT)
_____
Andrew Ranacis

# 20250603_Target Corp._Verification_Ranacis

Final Audit Report                                        2025-06-03

| | |
|---|---|
| Created: | 2025-06-03 |
| By: | Anthony Bowling (bowling@bespc.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAazhYO4teDrqkP-sQqO4x233q67HmE2q_ |

## "20250603_Target Corp._Verification_Ranacis" History

📄 Document created by Anthony Bowling (bowling@bespc.com)
2025-06-03 - 9:31:43 PM GMT- IP address: 69.36.208.200

📧 Document emailed to andrew.ranacis@gmail.com for signature
2025-06-03 - 9:32:07 PM GMT

📄 Email viewed by andrew.ranacis@gmail.com
2025-06-03 - 9:42:21 PM GMT- IP address: 104.28.123.94

🖋 Signer andrew.ranacis@gmail.com entered name at signing as Andrew Ranacis
2025-06-03 - 11:47:37 PM GMT- IP address: 47.158.118.210

🖋 Document e-signed by Andrew Ranacis (andrew.ranacis@gmail.com)
Signature Date: 2025-06-03 - 11:47:39 PM GMT - Time Source: server- IP address: 47.158.118.210

✅ Agreement completed.
2025-06-03 - 11:47:39 PM GMT

**Adobe Acrobat Sign**